IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CITY HEIGHTS HOLDINGS, LLC, a Washington limited liability company, | ) ) ) | No. 39974-5-III |
| Appellant, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| HOWARD R. HUNTER, an individual; MICHAEL S. LANCASTER and ANGELA M. LANCASTER, husband and wife and the marital community thereof, | ) ) ) ) ) | |
| Respondents. | ) ) | |

HILL, J.P.T.[†] — This appeal concerns the interpretation of two easements running over property now owned by Michael and Angela Lancaster, husband and wife, and Howard Hunter. In 1987, Plum Creek Timber Company, Inc., sold the two parcels of land that are now owned, respectively, by the Lancasters and Mr. Hunter, to separate individuals. The deeds reserved "a perpetual easement for the betterment, maintenance and use of existing roads" on a 60-foot right-of-way located across both properties. Clerk's Papers (CP) at 387-88, 396-97. City Heights now owns 358 acres of the undeveloped land that was previously owned by Plum Creek at the time of the easement reservation. It holds no recorded interest in the easement, but seeks to assert rights over the easement as a partial successor in interest of Plum Creek, to build a new access route

---

[†] Tyson Hill, an active judge of a court of general jurisdiction, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).

to its 358-acre master-planned development. City Heights claims the easement is appurtenant to its dominant parcel.

The parties filed cross motions for summary judgment after the Lancasters and Mr. Hunter sought to prohibit City Heights's use of the easement. The superior court granted summary judgment to the Lancasters and Mr. Hunter, finding the easement was either in gross or, if it were appurtenant, City Heights's proposed use would overburden the easement. On appeal, City Heights argues: (1) the easement is appurtenant to its dominant parcel—notably, not described within the deed—and asserts rights in the easement as Plum Creek's successor in interest; and (2) the proposed uses are within the scope of the easement.

Although the size and extent of the dominant estate is uncertain, we hold the strong presumption in favor of appurtenant easements, the location of the easement, and the language in the documents of conveyance indicate the original parties intended the easement to run with the land. However, we affirm the trial court's conclusion that City Heights's proposed use is beyond the scope of and overburdens the easement.

## FACTS

In 1987, Plum Creek Timber Company, Inc., deeded two parcels of land, now owned, respectively, by Michael and Angela Lancaster, together as husband and wife, and Howard Hunter, to separate and individual property owners (hereinafter "the

2

Lancaster property" and "the Hunter property").[1] The properties are adjacent residential

parcels of land located in unincorporated Kittitas County, near the northern border of Cle

Elum's city limits. The Lancaster property is an approximately 1.39-acre lot improved

with a single-family residence and private septic system installed in 2005.[2] The Hunter

property, located to the west of the Lancaster property, is a 1.51-acre lot improved with a

single-family residence, a two-bedroom mother-in-law suite, and a garage. Other than the

developed downtown area of the city of Cle Elum to the south of the properties, the

surrounding area is wooded and largely undeveloped. The 1987 deeds to the Lancaster

and Hunter properties described them as being situated on "[p]art of the southwest

quarter of the northeast quarter (SW1/4NE1/4) of Section 26, Township 20 North, Range

15 East, W.M." CP at 387, 396.

In both 1987 deeds, Plum Creek expressly reserved mineral rights and easements

over the properties. The 60-foot easement, reserved in both deeds and running across

both properties, is the subject of this dispute. Neither deed identified any parcel of land

---

[1] The Hunter property was originally conveyed to Thurlan and Helena Anderson and is identified as Kittitas County Parcel Number 20-15-26010-0002. The Lancaster property was originally conveyed to Brian Frederick as custodian for Roy and Sarah Frederick and is identified as Kittitas County Parcel Number 20-15-26010-0007.

[2] Kittitas County Public Health District issued a permit in 2005 to the previous owner of the lot, which included review of a title report that identified an "easement road." CP at 529. An environmental health specialist reviewed the report and site but "'was unable to find the road on any of [the county] databases.'" CP at 529. The drain field was designed to comply with a five-foot setback allowance from the easement.

other than the Lancaster and Hunter properties. Nor did they identify any land owned or

retained by Plum Creek.

*The 1987 Lancaster property deed*

The 1987 deed to what is now the Lancaster property reserved mineral rights and

two easements—a 60-foot wide easement and a 30-foot wide easement—to Plum Creek.

The deed provided as follows:

> THE GRANTOR, PLUM CREEK TIMBER COMPANY, INC., . . .
> conveys and warrants to the Grantee, BRIAN FREDERICK as Custodian
> for Roy D. Frederick and Sarah E. Frederick, both minors, . . . the
> following described real estate, . . .:
>
> > Part of the southwest quarter of the northeast quarter
> > (SW1/4NE1/4) of Section 26, Township 20 North, Range 15
> > East, W.M., as described further on the attached Exhibit A-1.
> >
> > Excepting and reserving, however, to the Grantor, for itself,
> > its successors and assigns, forever:
> >
> > All right, title and interest, legal and equitable, whatsoever,
> > however derived, reserved or held, in and to all geothermal
> > heat and all ores and minerals of any nature whatsoever,
> > including but not limited to oil, gas, other hydrocarbons . . .
> > (hereinafter "minerals") in and under or which may be
> > produced from the real property herein described (called
> > "premises"), together with the right to enter upon the
> > premises for the purposes of prospecting and exploring for
> > minerals by geophysical, geochemical or other means, and for
> > the purposes of drilling, extracting, opening, developing and
> > processing said minerals and erecting, operating and working
> > any extraction and processing facilities by any procedures
> > whatsoever, and the taking out, removing, carrying away,

transporting and storing all such minerals, together with the tenements, hereditaments and appurtenances. . . .

Also excepting and reserving to the Grantor, its successors and assigns, forever, a perpetual easement for the betterment, maintenance and use of existing roads on 30- and 60-foot rights of way located across said SW1/4NE1/4 of Section 26, Township 20 North, Range 15 East, W.M., as further described in Exhibit A-1 and shown on Exhibit A. Grantee agrees said 60-foot right-of-way will be used as access to no more than three (3) private residences on the land parcel described above. Grantee shall provide (by payment or provision of work and materials) for his share of the maintenance of said roadway occasioned by the Grantee's use thereof.
. . . .

The above described lands . . . are located as shown on Exhibit A attached hereto and made a part hereof.

CP at 387-88.

The attached legal description described the location of the property, "TOGETHER WITH AND SUBJECT TO an easement for ingress, egress and utilities, 60 feet in width," and "SUBJECT TO an easement for ingress, egress and utilities, 30 feet in width." CP at 390. The deed also included a depiction of the easements spread out on separate pages, which City Heights reconstructed into the following image:



CP at 332, 603. The light shaded area is designated as the property conveyed, situated

adjacent to the Hunter property, and the dark shaded areas represent the location of the

reserved easements. The parties do not dispute that the 30-foot easement is the dark

shaded portion running north and south through the property, and the 60-foot easement is

the curved portion, beginning with the 30-foot easement on the southern border of the

property and extending west to the property's western border, and continuing onto the

adjacent Hunter property.

The Lancasters later acquired the property through a quitclaim deed, in which the

30-foot easement is expressly referenced. Although the 60-foot easement is not

referenced directly, the deed cites to the description and illustration included in the 1987

deed that included both the 30- and 60-foot easements.

*The 1987 Hunter property deed*

In the 1987 deed to what is now the Hunter property, Plum Creek reserved to itself

the same mineral rights reserved over the Lancaster property and an easement over the

60-foot right-of-way where it extends from the Lancaster property and across the Hunter

property. The Hunter deed also *conveyed* a 60-foot easement to the grantees over the

portion the 60-foot easement reserved to Plum Creek across the Lancaster property,

connecting to Deer Creek Road. The deed provided as follows:

> THE GRANTOR, PLUM CREEK TIMBER COMPANY, INC., a
> Delaware corporation . . . conveys and quit claims to Thurlan Anderson and
> Helena Anderson, husband and wife, GRANTEES, their heirs and assigns,
> the following described real estate . . . :
>
>> Part of the southwest quarter of the northeast quarter
>> (SW1/4NE1/4) of Section 26, Township 20 North, Range 15
>> East, W.M., as described further in the attached Exhibit A-1.
>>
>> Together with a permanent easement 60 feet in width for
>> maintenance and use of an existing road over and across the
>> southwest quarter of the northeast quarter (SW1/4NE1/4) of
>> Section 26, Township 20 North, Range 15 East, W.M., as
>> described in Exhibit A-1 and as shown on the attached
>> Exhibit A. Grantees shall provide . . . for their share of the
>> maintenance of said roadway occasioned by the Grantees' use
>> thereof.

7

> Excepting and reserving, however, to the Grantor, for itself, its successors and assigns, forever:
>
> [Reservation of mineral rights]
>
> Also excepting and reserving to the Grantor, its successors and assigns, forever, a perpetual easement for the betterment, maintenance and use of existing roads on the 60-foot right of way located across said southwest quarter of the northeast quarter (SW1/4NE1/4) of Section 26, Township 20 North, Range 15 East, W.M., as described in Exhibit A-1 and as shown on Exhibit A. Grantees shall provide (by payment or provision of work and materials) for their share of maintenance of said roadway occasioned by the Grantees' use thereof. Grantees agree said 60-foot right of way will be used as access to no more than two (2) private residences on the land parcel described above.
> . . . .
> The above described lands . . . are located as shown on Exhibit A attached hereto.

CP at 396-97.

Like the deed to the Lancaster property, the attached legal description of the Hunter property described its location, "[t]ogether with and subject to an easement for ingress, egress and utilities, 60 feet in width," detailed therein. CP at 400 (capitalization omitted). The deed included a depiction of the easements, spread out on several pages, which City Heights reconstructed into the following image:

8



CP at 331, 603. The solid shaded boxed area is designated as the property conveyed,

situated directly west of the Lancaster property. The solid, slightly darker shaded curved

area represents the location of the 60-foot easement *granted* over the Lancaster property,

and the dark shaded area with diagonal lines across the northern border of the Hunter

property represents the 60-foot easement *reserved* to Plum Creek.

Mr. Hunter later acquired the property "'Subject to easements, restrictions and

reservations of record'" via a statutory warranty deed, in which the 60-foot easement was

expressly referenced. CP at 385.

*Existing roads at time of reservation*

It is undisputed that, in 1987, there were only two "existing roads" over the

southwest quarter of the northeast quarter of "Section 26:" (1) Montgomery Avenue that

becomes Deer Creek Road, and (2) the "fire road."[3] CP at 960. It is also uncontroverted

that the roads generally run in alignment with the two easements, as depicted in the

images attached to the deeds. Montgomery Avenue/Deer Creek Road was the preexisting

road running within the 30-foot wide easement identified in the Lancaster deed,

extending north and south along the property, and the fire road was the preexisting road

running along the 60-foot wide easement at issue in this case. The parties conceded the

locations of the "existing roads." CP at 388, 397.

Montgomery Avenue/Deer Creek Road was historically used by Plum Creek

to haul product and materials during its periods of operation. It has also been historically

and consistently used as an access road for neighboring residential landowners to the

north.

The fire road was historically a rough dirt roadway connecting Montgomery

Avenue/Deer Creek Road with East Fifth Street. A neighboring landowner, residing on

his property since 1974, recalled the fire road "was used primarily for fire protection and

---

[3] The parties, both in the superior court and in their briefing to this court, appear to dispute the name of the second road, but do not dispute its location. City Heights refers to it as Montgomery Avenue, or an extension of Montgomery Avenue, while the Lancasters and Mr. Hunter refer to it as the driveway, a dirt pathway or trail, or the fire road. The evidence supports that the road both parties describe as veering to the west over the Hunter and Lancaster properties off Montgomery Avenue/Deer Creek Road, was referred to in 1987 as the "fire road" connecting Montgomery Avenue to East Fifth Street. CP at 961. For consistency, we also refer to the road as the "fire road."

incidental access" in the 1970s, but "has never been actively used as a roadway" in the past 50 years, and has ceased to be used for any vehicle traffic since at least the early 1990s other than to serve as an access road to the Lancaster and Hunter properties. CP at 961. The Lancasters and Mr. Hunter obtained additional supporting declarations from several others with knowledge of the road since as early as the 1990s, reporting they had never known Plum Creek to use the road for any purpose. City Heights provided no evidence of Plum Creek's historical use or of any historical use of the road.[4]

The portion of the fire road running across the Lancaster and Hunter properties has since been paved into a 10-foot wide driveway serving both properties, and is the only reported present use of the road. The preexisting dirt "fire road" continues from the paved driveway until it reaches East Fifth Street.

*City Heights development project and proposed use of 60-foot easement*

City Heights presently owns 358 acres of land within the city of Cle Elum, located along the northern edge of the existing developed downtown area. City Heights acquired the land in 2019 along with the development rights to build a mixed-use master planned development (hereinafter "City Heights Development" or "Development"). The

---

[4] In its statement of facts on appeal, City Heights claims "the Easement has had a road running over it in existence for decades, serving purposes such as logging, construction, and fire access." Appellant's Opening Br. at 18. It cites to no evidence supporting its claimed use of the road, but only to maps showing the location of the road.

11

Development is a phased project that will include approximately 962 residential units in addition to neighborhood commercial spaces and designated open spaces with trails available for recreational purposes.[5] The conveyance deed did not assign to City Heights any rights to the 60-foot easement at issue in the case.

City Heights seeks to assert rights over the 60-foot reserved easement running across both the Lancaster and Hunter properties. It plans to create a "collector road" that will ultimately extend Montgomery Avenue/Deer Creek Road over the 60-foot reserved easement and through the Development to connect to Summit View Drive, the road on the western terminus of the property. CP at 324. The road will serve as a "second point of access for residents and emergency vehicles using Summit View Drive." CP at 324.

---

[5] Prior to City Heights's acquisition of the property and development rights, what is now the City Heights Development was initially submitted in 2009 to the city of Cle Elum by Northland Resources, LLC, as authorized agent for the previous property owners. At the time, only 28 of the relevant 358 acres were incorporated within the city of Cle Elum and were zoned as residential. Northland Resources filed concurrent petitions to annex the remaining 330 acres of its unincorporated land into the city of Cle Elum and to zone the entirety of the 358 acres as planned mixed use. In 2011, following the preparation and publication of an environmental impact statement and various public hearings on the proposed development and land use changes, the city granted the petitions, designated the land as a planned action in accordance with the environmental review, and entered into a development agreement with the property owners authorizing the execution of the project. The project languished over the ensuing years and the original owners faced foreclosure, effectuating the sale of the property and the development rights to City Heights in 2019.

The original "Master Site Plan," approved in 2011, contemplated Montgomery Avenue as one of several access points to the Development from public roads. *See* CP at 278. It proposed three options—A, B, and C—for the location of the new access point extending west from Montgomery Avenue. City Heights has since submitted applications for the first four phases of the project, all of which are located within the western portion of the Development, between Summit View Drive and Montgomery Avenue/Deer Creek Road. Phase 2 of the project, which includes the development of 69 out of the total planned residential units all located outside the southwest quarter of the northeast quarter of Section 26, required the secondary access route from Montgomery to be built. City Heights chose option B, the option connecting Montgomery Avenue to the Development through the 60-foot easement.

City Heights wishes to "improve[ ]" the existing roadway on the portion of the proposed extension running through the 60-foot easement—the driveway and part of the dirt road—but keeping within the boundaries of the easement. CP at 318, 321. As a result of the extension a new intersection will be created at Montgomery Avenue/Deer Creek Road. "The proposed design includes 16' of pavement with 2' gravel shoulders on each side for 20' of roadway . . . which is an improvement over existing conditions." CP at 324.

13

A transportation analysis was done that assessed the transportation impacts related to the planned development.[6] It projected 8,650 new daily trips at full buildout, with an estimated 607 vehicle trips during the morning peak hours and 840 vehicle trips during the afternoon/evening peak hours. The review did not include analysis of traffic impacts specifically for the Lancaster or Hunter properties; however, it did contemplate the possible uses of Montgomery Avenue for serving the Development. It projected 361 of the anticipated vehicle trips during the afternoon/evening peak hours would use the North Montgomery Avenue access.

*Procedural history*

City Heights moved to quiet title after the Lancasters and Mr. Hunter sought to prohibit access. Thereafter, the parties submitted cross motions for summary judgment, asking the superior court to determine whether the 60-foot easement is appurtenant or in gross, and, if appurtenant, whether City Heights's proposed use is within the easement's scope.

City Heights argued the easement was created appurtenant to Plum Creek's dominant tenement, now owned by City Heights. It claimed that, in 1987, Plum Creek

---

[6] An environmental impact statement was issued in 2010 assessing the projected transportation impacts for the full City Heights Development. An updated transportation assessment for the first three phases of the project was done in May 2021, that reported traffic volumes have changed very little since the 2010 environmental impact statement was issued.

owned approximately 39,753 acres of land in Kittitas County, including the land now owned by the respective parties to this case, and that, when it conveyed the Lancaster and Hunter properties, Plum Creek retained ownership of the surrounding land. City Heights argued the plain language of the easement reservation proves Plum Creek intended to create an easement appurtenant to Plum Creek's dominant tenement consisting of its remaining land. As one of Plum Creek's successors in interest, City Heights claimed rights to the easement.

The Lancasters and Mr. Hunter requested the superior court declare that the easement was created in gross for Plum Creek for commercial purposes and, thus, City Heights has no easement rights over or across their respective parcels for development of an access road to serve the City Heights Development. In the alternative, the Lancasters and Mr. Hunter argued City Heights's planned use of the easement exceeded its scope or otherwise overburdened the easement.

The superior court granted summary judgment to the Lancasters and Mr. Hunter, finding the easement was either in gross or, if appurtenant, that City Heights's proposed use overburdens the easement.

City Heights now appeals to this court.

ANALYSIS

*Whether the easement is in gross or appurtenant*

The parties agree that the deeds are unambiguous, yet they come to opposite conclusions on what the deeds convey. City Heights argues the reserved easements over the Lancaster and Hunter properties unambiguously created a broad easement appurtenant benefiting the now City Heights property. It claims the language used in the deeds, in consideration of the presumption in favor of appurtenant easements, and the fact that Plum Creek, the owners of the adjacent land, reserved the easement in the deeds for ingress, egress, and utilities, indicates the easement was intended to be appurtenant. The Lancasters and Mr. Hunter argue the easement was unambiguously reserved in gross for the benefit of Plum Creek, the corporation, as a commercial easement. They point to the easement being reserved to the grantor, without mention or reference to an identifiable dominant estate.

The superior court understandably struggled to resolve this issue. It found there were elements of both an easement appurtenant and in gross. In the end, the court declined to decide the issue, finding that the easement was either in gross or it was appurtenant, but that City Heights's proposed use would overburden it.

We review de novo the superior court's summary judgment decision. *Wilkinson v. Chiwawa Cmtys. Ass'n*, 180 Wn.2d 241, 249, 327 P.3d 614 (2014). Summary judgment

16

will be affirmed if there are no genuine issues of material fact and the moving party is

entitled to judgment as a matter of law. *Id.* Judgment as a matter of law is warranted "if

reasonable people could reach one conclusion based on the evidence when viewing the

facts in the light most favorable to the nonmoving party." *O.S.T. v. Regence BlueShield*,

181 Wn.2d 691, 703, 335 P.3d 416 (2014). Conclusory statements of fact will neither

support nor defeat a motion for summary judgment. *Overton v. Consol. Ins. Co.*, 145

Wn.2d 417, 430, 38 P.3d 322 (2002). A court may grant a motion for summary judgment

only if, on the basis of the facts submitted, "'reasonable [minds] could reach but one

conclusion.'" *SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 140, 331 P.3d 40 (2014)

(alteration in original) (internal quotation marks omitted) (quoting *Trimble v. Wash. State

Univ.*, 140 Wn.2d 88, 93, 993 P.2d 259 (2000)).

*Law on easements*

An easement is a right to use the land of another, servient estate. *City of Olympia

v. Palzer*, 107 Wn.2d 225, 229, 728 P.2d 135 (1986); *Hanna v. Margitan*, 193 Wn. App.

596, 606, 373 P.3d 300 (2016). Easements may either be appurtenant or in gross. *Olson v.

Trippel*, 77 Wn. App. 545, 554, 893 P.2d 634 (1995). Appurtenant easements benefit a

dominant estate and require two estates at the time of creation; easements in gross benefit

a person or entity. *Roggow v. Hagerty*, 27 Wn. App. 908, 911, 621 P.2d 195 (1980).

For easements in gross, "there need not be two estates, for the easement belongs to the grantee regardless of ownership of any other land." *Id.*

An appurtenant easement automatically runs with the land of the dominant estate, even if not expressly mentioned in the transfer instrument, unless the parties otherwise agree. *Olson*, 77 Wn. App. at 552; *M.K.K.I., Inc. v. Krueger*, 135 Wn. App. 647, 655, 145 P.3d 411 (2006). An easement in gross remains reserved to the individual or entity even upon sale of the property. *Kirk v. Tomulty*, 66 Wn. App. 231, 237, 831 P.2d 792 (1992).

In Washington, easements in gross are not favored and "there is a 'very strong' presumption that an easement is appurtenant rather than in gross." *Olson*, 77 Wn. App. at 554 (quoting *Pioneer Sand & Gravel Co. v. Seattle Constr. & Dry Dock Co.*, 102 Wash. 608, 618, 173 P. 508 (1918)). This "very strong" presumption has led courts to conclude that "[a]n easement is not in gross when there is anything in the [instrument] which indicates that it was intended to be appurtenant." *Green v. Lupo*, 32 Wn. App. 318, 323, 647 P.2d 51 (1982).

*Interpretation of easements*

"'Courts interpret easement grants to give effect to the parties' original intent.'" *Hanna*, 193 Wn. App. at 610 (quoting *Snyder v. Haynes*, 152 Wn. App. 774, 779, 217 P.3d 787 (2009)); *see Pelly v. Panasyuk*, 2 Wn. App. 2d 848, 865, 413 P.3d 619 (2018). The interpretation of an easement presents a mixed question of fact and law. *Sunnyside*

*Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003). Determining the original parties' intent presents a question of fact, and the legal consequence of their intent is a question of law. *Id.* Here, by filing cross motions for summary judgment, the parties concede they are entitled to a judgment as a matter of law. *See Mustoe v. Xiaoye Ma*, 193 Wn. App. 161, 164, 371 P.3d 544 (2016).

"The rules of contract interpretation apply to interpretation of an easement and a deed." *Pelly*, 2 Wn. App. 2d at 864; *see Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999). "[T]he language of the written instrument is the best evidence of the intent of the original parties to a deed." *Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*, 168 Wn. App. 56, 65, 277 P.3d 18 (2012). The intent of the original parties to an easement is determined by looking to the deed as a whole. *Sunnyside*, 149 Wn.2d at 880.

Washington continues to follow the objective manifestation theory of contracts. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "Under this approach, we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Id*. Consistent with the general rule of parol evidence, extrinsic evidence may only be admitted to assist with interpreting "the meaning of *specific words and terms used*," but not to contradict or supplement the intent of an integrated,

19

unambiguous instrument or to "vary, contradict or modify the written word." *Hollis*,

137 Wn.2d at 696, 695; *see Go2Net, Inc. v. C I Host, Inc.*, 115 Wn. App. 73, 84, 60 P.3d

1245 (2003) (Extrinsic evidence of a party's unilateral or subjective intent as to a

contract's meaning may not be used.). Except in cases where the dispute over

interpretation is between the original parties, we determine intent only from the

documents in the recorded chain of title. *Olson*, 77 Wn. App. at 553-54. "To hold

otherwise would be to require that a subsequent purchaser investigate not only the chain

of title, but also the 'context' within which each conveyance in the chain was executed."

*Id.* at 553. Neither the Lancasters and Mr. Hunter nor City Heights were the original

parties to the deed but are subsequent purchasers of the land. Neither party has asserted

a claim that the Lancasters had a duty of inquiry.[7] *See id.* at 551 ("The burden of showing

a duty of inquiry rests on the one asserting it."). Our analysis is accordingly limited to the

documents themselves.

The Lancasters and Mr. Hunter argue any ambiguity should be construed against

the grantor. They cite to *Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines*

*Association*, in which the court noted "ambiguity in a deed is resolved against the

---

[7] A duty of inquiry exists if a purchaser has "'information, from whatever source derived, which would excite apprehension in an ordinary mind and prompt a person of average prudence to make inquiry.'" *Paganelli v. Swendsen*, 50 Wn.2d 304, 308, 311 P.2d 676 (1957) (quoting *Daly v. Rizzutto*, 59 Wash. 62, 65, 109 P. 276 (1910)).

grantor." 156 Wn.2d 253, 272, 126 P.3d 16 (2006). However, the court in *Kershaw* was not engaging in the question of determining whether the right-of-way created an easement in gross or appurtenant, in which the presumption in favor of easements appurtenant applies. *See Weyerhaeuser Co. v. Burlington N., Inc*., 15 Wn. App. 314, 320, 549 P.2d 54 (1976) (noting ambiguity to be construed against grantor when determining the *scope* of a mineral right).

The Lancasters and Mr. Hunter further analogize the presumption in favor of easement appurtenances with evidentiary presumptions, claiming that the presumption may be rebutted when there is evidence indicating an easement in gross. *See Callen v. Coca Cola Bottling, Inc*., 50 Wn.2d 180, 182, 310 P.2d 236 (1957) ("[P]resumption does not have the force of evidence; that is, it does not shift the burden of proof from plaintiff to defendant, but simply casts on the defendant the burden of going forward with rebuttal evidence."). But notably, Division Two of this court in *Olson* addressed this very issue, albeit in a footnote:

> Analogizing to evidential presumptions, the [defendants] argue that the presumption described in the text disappears in the face of evidence to the contrary. We reject that argument. Unlike an evidential presumption, the presumption in the text is designed to effectuate a substantive policy favoring appurtenant easements and disfavoring easements in gross.

77 Wn. App. at 555 n.17.

Further, any argument made that the presumption does not apply to written instruments is unsupported. While it has been recognized that the presumption should not be *necessary* when an easement is created by a written instrument, it has been recognized that "[i]n practice, however, draftsmen often are incomplete in drafting. . . . When language is incomplete or missing, courts routinely consider the nature of the easement, its purposes, and the surrounding circumstances . . . . *The presumption in favor of appurtenant easements usually means that an easement will be held appurtenant if it is capable of serving a dominant estate in the circumstances.*" 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 2.2, at 85 (2d ed. 2004) (emphasis added).

City Heights argues the plain language of the deed unambiguously shows the intent was to create an easement appurtenant to Plum Creek's dominant estate. It points to three sections of the deed to support that assertion: (1) the deeds reserved "to the Grantor, its successors and assigns, forever, a perpetual easement . . . ." CP at 388, 397; (2) in comparison, the reserved mineral rights are reserved "to the Grantor, *for itself*, its successors and assigns, forever." CP at 387, 396 (emphasis added); and (3) the easement is reserved "for the betterment, maintenance and use of existing roads" and "for ingress, egress and utilities." CP at 388, 397, 390, 400. City Heights additionally argues that given the easement was reserved in the deeds, a description of the servient

22

estate was included thereby satisfying the statute of frauds and the strong presumption in favor of easements appurtenant, and that these statements unambiguously created an appurtenant easement, regardless of the fact that there is no description or mention of a dominant estate. While we disagree with some of City Heights's interpretations, we nevertheless agree the documents as a whole created an easement intended to run with the land.

### Successors and assigns

City Heights argues the conveyance of an easement to "successors and assigns," as well as the inclusion of the language "forever, a perpetual easement" is conclusive evidence that the easement is appurtenant. It claims the language indicates a general conveyance, similar to a conveyance to "owners," rather than a conveyance to a specific individual and also indicates the easement will remain with the land and will not expire, "meaning it simply cannot be an easement in gross" and that the primary beneficiary is the property. Appellant's Opening Br. at 34. The Lancasters and Mr. Hunter argue such language *severs* the right to use the easement from the land and transfers the right to the identified corporate entity.

Contrary to City Heights's claim, the language of the deed expresses that the easement was not generally reserved simply to "successors and assigns." Rather, it was reserved "*to the Grantor, its* successors and assigns . . . ." CP at 388, 397 (emphasis

23

added). It is clear "successors and assigns" refers to the "Grantor's" successors and assigns.

But the proposition that "Grantor" is similar to "owner," thereby suggesting the easement's beneficiary is the owner/grantor's property, is arguably unsupported where the deed does not identify any land owned or retained by the "Grantor." The beginning of the deed names "[t]he Grantor" as "Plum Creek Timber Company, Inc., a Delaware corporation," without reference to any dominant parcel of land. CP at 387, 396 (some capitalization omitted). Thus, based on the plain language of the deed, "Grantor" arguably only refers to Plum Creek, a named individual entity. "An easement is more likely appurtenant when the easement is conveyed to 'owners of lots 1, 2, and 3,' rather than the names of the individuals." *M.K.K.I.*, 135 Wn. App. at 655 (internal quotation marks omitted). On the other hand, "[t]he designation of named individuals as dominant owners evidences an intent that the easement be personal to the named parties." *Green*, 32 Wn. App. at 322. Taken as a whole, this initially weighs in favor of an easement in gross.

Contrastingly, the terms "successors and assigns" as well as "forever, a perpetual easement" suggest, but do not concretely identify, an easement appurtenant. A review of authority suggests the use of "heirs or assigns," or other similar wording is not conclusive evidence of intent to create an easement appurtenant nor would it render the right to

24

assign illusory if the easement was deemed appurtenant. Washington case law has yet to

reach a conclusion on the issue of whether easements in gross are transferable. *See*

17 STOEBUCK & WEAVER, *supra* § 2.10, at 116-17. While historically, easements in gross

may not have been considered transferable, modern law suggests a new trend. *See* 28A

C.J.S. *Easements* § 19 (2019). The *Restatement (First) of Property* provides that

easements in gross are transferable if they are "commercial," but not if they are

"personal." *See* RESTATEMENT (FIRST) OF PROPERTY § 487 (AM. LAW INST. 1944). Other

sources indicate the language is indeed generally held to create an appurtenant easement,

but that "such words are not essential for this purpose, and even the use of such words

does not create an easement appurtenant, where the element of a dominant estate is

lacking." 28A C.J.S. *Easements* § 19 (footnote omitted) (surveying caselaw from other

states).

Thus, the language *may* suggest the easement is appurtenant, unless contrary

evidence of intent shows otherwise. Here, the remaining evidence strongly indicates an

appurtenant easement.

*Mineral rights*

A review of the Lancaster and Hunter deeds as a whole helps to clarify the intent

of the parties. *See Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 713,

334 P.3d 116 (2014) (stating that courts interpret a contract "as a whole, interpreting particular language in the context of other contract provisions").

The deeds, in which the easements are reserved, also reserve mineral rights. They are reserved "to the Grantor, *for itself*, its successors and assigns, forever." CP at 387, 396. As the Lancasters and Mr. Hunter note in their reply brief, this is far more akin to an easement in gross and the same "successors and assigns" language was used in both the easement language and the reservation of mineral rights. However, the easement reservation contained one notable omission—it did not include the "for itself" language.

The inclusion of "for itself" in the mineral rights reservations and the absence of such words in the easement reservations, reserving only "to the Grantor, its successors and assigns," is indicative of the drafter's intent to create different interests. *See Guillen v. Contreras*, 169 Wn.2d 769, 776, 238 P.3d 1168 (2010) ("'[W]here the Legislature uses certain statutory language in one instance, and different language in another, there is a difference in legislative intent.'") (internal quotation marks omitted) (quoting *State v. Jackson*, 137 Wn.2d 712, 724, 976 P.2d 1229 (1999))). "For itself" clearly identifies a right reserved to Plum Creek the entity, while its absence from the easement language suggests an intentional omission to differentiate the interests and create an easement that ran with the land, rather than one held only by the Grantor, for itself.

26

*Ingress, egress, and utilities*

Perhaps the most telling language in the deeds is the stated use of the easements for "ingress, egress and utilities." This language strongly favors a finding of an easement appurtenant. *Winsten v. Prichard*, 23 Wn. App. 428, 430, 597 P.2d 415 (1979). In *Winsten*, the court noted that easements which are reserved for "[i]ngress, egress and utilities are purposes which are normally associated with land use rather than personal convenience." *Id.* at 430-31. This rationale is stronger still where, as here, the easement extends to the end of the servient property. *See M.K.K.I*, 135 Wn. App. at 655 ("An easement extending to the end of a servient property is consistent with an intent to serve the adjacent property.").

*Dominant estate*

The only issue giving the court pause is the lack of any description or reference to any adjacent dominant parcels of land or any land other than the now Lancaster and now Hunter properties—the servient estates. However, easements fall within the statute of frauds, which requires only a description of the servient estate. A dominant estate is nonetheless still required to *exist* to create an easement appurtenant. *See Berg v. Ting*, 125 Wn.2d 544, 549, 886 P.2d 564 (1995); *Roggow*, 27 Wn. App. at 911. The following review of Washington practice is helpful:

American appellate courts, including Washington's, frequently say there is a presumption that an easement is appurtenant rather than in gross. No such presumption should be necessary when an easement is created by written instrument; if an easement across Blackacre is to serve Whiteacre, the instrument should describe both parcels and should expressly say the easement is to serve, or is appurtenant to, Whiteacre. In practice, however, draftsmen often are incomplete in drafting. . . . When language is incomplete or missing, courts routinely consider the nature of the easement, its purposes, and the surrounding circumstances, including the fact that the holder of the easement owned land that was capable of being served by the easement. The presumption in favor of appurtenant easements usually means that an easement will be held appurtenant if it is capable of serving a dominant estate in the circumstances.

17 STOEBUCK & WEAVER, *supra*, § 2.2, at 85 (footnotes omitted).

Washington courts have not directly addressed the issue of whether a description of the dominant estate is required. The Lancasters and Mr. Hunter list several examples of other states that have concluded that a description is required. *See, e.g.*, *Bos Terra, LP v. Beers*, 2015 MT 201, ¶ 12, 380 Mont. 109, 354 P.3d 572 ("'When the identity of the dominant tenement has been omitted and cannot be ascertained from the documents of conveyance, an easement appurtenant has not been adequately described.'") (internal quotation marks omitted) (quoting *Davis v . Hall*, 2012 MT 125, ¶ 20, 365 Mont. 216, 280 P.3d 261)); *Hornsilver Circle, Ltd. v. Trope*, 904 P.2d 1353, 1356 (Colo. App. 1995) ("No particular words are necessary for the grant of an easement, but the instrument must identify with reasonable certainty the easement created and the dominant and servient tenements."); *Oakes v. Hattabaugh*, 631 N.E.2d 949, 951 (Ind. Ct. App. 1994) ("An

instrument creating an express easement should describe with reasonable certainty the easement created and the dominant and servient tenements."); *Ricelli v. Atkinson*, 99 Ohio App. 175, 132 N.E.2d 123, 127 (1955) ("A reservation of an easement is not operative in favor of land not described in the conveyance."); *Branch v. Occhionero*, 239 Conn. 199, 204, 681 A.2d 306 (1996) ("In order to create a right-of-way as an appurtenance to the dominant estate, both the dominant and servient estates must be identified.").

The reasoning of the Lancasters and Mr. Hunter is persuasive, but Washington has issued a ruling finding an appurtenant easement despite the lack of a dominant estate in the deed in *Winsten*, 23 Wn. App. 428. While the case is not dispositive given it does not address this issue directly, it does provide useful guidance.

In *Winsten*, an owner subdivided his land and sold part of it, reserving in the deed an easement "for ingress, egress and utilities." *Id.* at 429. The facts do not indicate whether the deed itself described or identified a dominant estate. *See id.* However, noting such uses are typically associated with land use, Division One of this court held that the reservation in the deed, "coupled with the fact that [the original grantor] retained ownership of the neighboring lots 9 through 11 when the easement was reserved, is prima facie evidence of an intention that the easement benefit those lots." *Id.* at 431. Where

29

"[n]o evidence demonstrate[d] a contrary intention," the court held the easement was

appurtenant. *Id.*

Thus, this suggests that, while a dominant estate need not necessarily be *described*

in a deed, its existence must be ascertainable from the documents of conveyance or from

the nature of the easement, its purposes, and the surrounding circumstances, including the

fact that the holder of the easement owned land that, at the time the easement was

originally created, was capable of being served by the easement.

Here, City Heights acknowledges the deed does not describe a dominant estate.

But, like *Winsten*, the deeds as a whole described an easement that would serve a

neighboring property owned by Plum Creek. The evidence considered by the superior

court on summary judgment showed Plum Creek did own and retain adjacent land after it

sold the Lancaster and Hunter properties. Specifically, City Heights points to a

"Washington Confirmation Special Warranty Deed" recorded September 22, 1983, in

which Burlington Northern Railroad Company conveyed 39,753.53 acres of land—which

included the now City Heights, Lancaster, and Hunter properties—to BN Timberlands

Inc., (a wholly owned subsidiary). CP at 608 (some capitalization omitted). To support

their claim that BN Timberlands Inc. and Plum Creek Timber Company, Inc., are the

same party, they cite to a recorded "Correction Deed" from PCTC, Inc., to Plum Creek

Timber Company, LP, dated December 21, 1992. CP at 630-32 (some capitalization

30

omitted). The deed states "PCTC, Inc." was "formerly known as Plum Creek Timber

Company, Inc. and BN Timberlands, Inc." CP at 630 (some capitalization omitted).

While it is true that the Correction Deed was executed more than five years after the

deeds and easement reservations that are subject to this litigation, and specifically

corrects a conveyance effective as of June 8, 1989, approximately two years after the

transactions involved in this proceeding, the issue is whether a dominant estate existed—

not whether it was identified in the deeds. "When language is incomplete or missing,

courts routinely consider the nature of the easement, its purposes, and the surrounding

circumstances, including the fact that the holder of the easement owned land that was

capable of being served by the easement. The presumption in favor of appurtenant

easements usually means that an easement will be held appurtenant *if it is capable of

serving a dominant estate in the circumstances*." 17 STOEBUCK & WEAVER, *supra*, § 2.2,

at 85 (emphasis added).

The record before us shows that Plum Creek owned land adjacent to the property it

deeded to the Lancasters and Mr. Hunter, which land is now owned by City Heights. The

easement created in the deeds was *capable* of serving a dominant estate. Therefore, a lack

of a description of the dominant estate is not fatal to finding an easement appurtenant.

However, as will be discussed presently, this does not suggest, as City Heights argues,

that the dominant estate consisted of nearly 40,000 acres of land. Instead, our holding is

31

limited to finding, in light of the strong presumption in favor of easements appurtenant,

the language in the deed indicating the intent of the parties to create such an easement,

and the location of the easement continuing onto adjacent property on the maps attached

to the deeds, the intention of the parties was to create an easement appurtenant rather than

a personal easement to Plum Creek.

*Whether City Heights's proposed use overburdens the existing road easement*

City Heights argues the plain unambiguous terms of the easement and the facts

that existed at the time it was created—that Plum Creek owned a large parcel of land and

reserved the easement for "the betterment, maintenance and use of existing roads on the

60-foot right of way"—dictate the intent of the easement is to serve the larger area with a

capable road system that connects to the public road system in Cle Elum and out to the

interstate. CP at 397. The Lancasters and Mr. Hunter argue the plain language of the deed

and the surrounding circumstances clearly indicate the proposed use is beyond the scope

and overburdens the contemplated purposes and uses of the easement. We agree with the

Lancasters and Mr. Hunter.

In determining the scope of an easement, courts look "to the deed's language,

the intention of the parties connected with the original easement, the circumstances

surrounding the deed's execution, and the manner in which the easement has been used."

*810 Props. v. Jump*, 141 Wn. App. 688, 696, 170 P.3d 1209 (2007). The court's objective

must be to "effectuate the intent of the parties who created it." *Wilson & Son Ranch, LLC*

*v. Hintz*, 162 Wn. App. 297, 306, 253 P.3d 470 (2011).

City Heights argues its use is unlimited and that the only limitation is on the

servient estate. This is unsupported. Plum Creek limited the use of the easement by the

dominant estate to "the betterment, maintenance and use of existing roads . . . located

across said [SW1/4NE1/4] of Section 26." CP at 388, 397. The language does not allow

for the development of new roads. Rather, while improvements are allowed, the easement

unambiguously restricts use to the *existing* roads within a defined geographic area.

City Heights claims it is indeed proposing to use the portion of the preexisting fire

road that runs across the Lancaster and Hunter properties but only wishes to build a new

road once it reaches its own property. City Heights states in clear and certain terms its

intent to develop a "new" urban level arterial over the 60-foot easement. However, it

seeks to do so along the 60-foot easement, in the general vicinity of the existing road. To

the extent the proposed road runs over the easement, City Heights argues its proposals to

bring the road to compliance with county standards, with deviation, is consistent with the

stated use of "betterment" and "maintenance."

In *Sunnyside*, our Supreme Court adopted the law that "an easement can be

expanded over time if the express terms of the easement manifest a clear intention by the

original parties to modify the initial scope based on future demands. The face of the easement must manifest this clear intent." 149 Wn.2d at 884. In that case, the easement reserved to the Sunnyside Valley Irrigation District the "'right and permission to enter upon said land for the . . . enlargement and repair of said . . . laterals, . . . and to . . . maintain and repair the same . . . ." *Id.* (emphasis added) (alterations in original). "Laterals" referred to irrigation ditches. *Id*. at 876. The court held the language manifested a clear intent to enlarge the laterals and its maintenance area based on future irrigation demands. *Id.* "Only when this intent is found should a court go to the next step of determining whether the proposed expansion is necessitated by the future demands contemplated by the original parties." *Id.* at 884.

The language in the present case is not as clear. The road at issue was a rough dirt roadway. The only evidence in the record suggests it may have been used for fire protection and incidental access in the 1970s but has never been actively used as a roadway since, including when the easements were reserved. While the deeds allow for "betterment, maintenance and use of the existing roads," it is not clear that "betterment" equates with the type of expansion and improvement intended by City Heights. CP at 388, 397.

*Expansion*

In Washington, it is "a flat rule that an easement that is appurtenant to a given parcel of land may not be used to serve another parcel." 17 STOEBUCK & WEAVER, *supra*, § 2.9, at 111. Generally, "an easement appurtenant to one parcel of land may not be extended by the owner of the dominant estate to other parcels owned by him, whether adjoining or distant tracts, to which the easement is not appurtenant." *Brown v. Voss*, 105 Wn.2d 366, 371, 715 P.2d 514 (1986).

City Heights claims the right to use the easement for properties lying outside the southwest quarter of the northeast quarter of Section 26—as is the clearly defined geographical scope of the easement—but on property within the approximately 40,000 acres it claims was originally owned by Plum Creek. This is where the lack of a defined dominant estate becomes problematic. City Heights seems to acknowledge this issue. While the record suggests an estate capable of being served by the easements existed at the time of creation, the evidence does not support that the dominant estate consisted of more than the defined aforementioned geographical scope. City Heights's intended use of the easement for properties that are not clearly identifiable as belonging to a dominant estate would be an impermissible expansion.

*Overburden*

The dominant tenement owner may not unreasonably increase the burden on the servient estate. *Olympic Pipe Line Co. v. Thoeny*, 124 Wn. App. 381, 393, 101 P.3d 430 (2004). "The owner of an easement trespasses if he or she misuses, overburdens, or deviates from an existing easement." *Id.* In interpreting whether a use is within the scope of a reserved easement, "ambiguity in a deed is resolved against the grantor." *Kershaw Sunnyside Ranches*, 156 Wn.2d at 272.

"The law assumes parties to an easement contemplated changes in the use of the easement that may have not existed at the time of the grant." *810 Props.*, 141 Wn. App. at 697. "Normal changes in the manner of use and resulting needs will not, without adequate showing, constitute an unreasonable deviation from the original grant of the easement." *Logan v. Brodrick*, 29 Wn. App. 796, 800, 631 P.2d 429 (1981).

The language of the easement is ambiguous as to the extent "betterment, maintenance and use" is allowed. The record shows that the 60-foot easement was historically used by Plum Creek for only incidental access use and fire protection. Other than the Lancasters' and Mr. Hunter's use as a driveway, there is no evidence that in some 37 years following the easement reservation, Plum Creek, any "successor or assign," or any dominant estate owner has used the existing road connecting with East Fifth Street for road purposes. Further, the limitation in the deeds on the grantees' use of

36

only the 60-foot easement, and not on the 30-foot easement, specifically for limited residential access, is indicative of Plum Creek's intent that the road only be used minimally in comparison to the 30-foot easement (Deer Creek Road). Moreover, other than the developed downtown area of Cle Elum, the area surrounding the properties is primarily zoned forest, range zoning, and rural 3 zoning.

Now, City Heights proposes to change from no use of, at best, a dirt road, over the past 37 years, to an access road serving a 962-lot mixed use planned development. Transportation counts project a potential for 5,145 average daily trips over the new roadway. This massive increase in daily use almost certainly was not contemplated by the original parties. We therefore agree with the superior court that City Heights's proposed use is beyond the scope of the easement and would overburden it.

## CONCLUSION

The superior court did not determine whether the easement was appurtenant or in gross. We hold the sum of the evidence shows the easement is appurtenant. We agree with the superior court that the proposed use is beyond the scope of and overburdens the easement, and affirm on that basis.

No. 39974-5-III
*City Heights Holdings v. Hunter*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Hill, J.P.T.

WE CONCUR:

_____
Staab, A.C.J.

_____
Cooney, J.